**Albert L. BAILEY, Jr., and Barbara J. Bailey, Plaintiffs-Appellants,**

v.

**HARTFORD FIRE INSURANCE CO., Defendant-Appellee.**

No. 828, Docket 76–7564.

United States Court of Appeals, Second Circuit.

Argued April 6, 1977.

Decided Nov. 9, 1977.

Max Ander, New York City, for plaintiffs-appellants.

Greenhill & Speyer, New York City, for defendant-appellee.

Before OAKES, Circuit Judge, and WYZANSKI* and HOLDEN,** District Judges.

HOLDEN, District Judge:

This is an appeal from the grant of summary judgment on motion by the defendant Hartford Fire Insurance Company in an action on the Home Owners Policy issued to the plaintiffs. The cause was commenced in the Supreme Court of the State of New York and removed to the United States District Court for the Eastern District of New York on the basis of diversity jurisdiction.

The property which the Hartford Fire Insurance Company undertook to insure for a three year period from July 12, 1974 is a single family dwelling on Staten Island. Prior to the loss on July 13, 1975, the property was supported by a reinforced concrete retaining wall that extended ninety feet along the rear of the property at a distance of five feet from the plaintiffs' rear wall. The loss sought to be recovered was sustained during a violent storm when about sixty feet of the retaining wall collapsed.[1]

* Senior Judge of the United States District Court for the District of Massachusetts, sitting by designation.

** Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

1. It appears from the letter written by the plaintiff Albert Bailey to the defendant on July 20, 1975, that he and his family at first believed that lightning had struck the chain link fence embedded in the retaining wall. The incident was reported to the police department at the 120th precinct in St. George. Two officers were dispatched to investigate. The police reported the misadventure to the New York City Building Department. Further examination by

The rupture of the retaining wall removed the lateral support from the foundation and the rear wall of the house that rested on the foundation, rendering the premises unsafe and uninhabitable.

The next day, July 14th, the Department of Buildings of the New York City Housing Development Administration directed the plaintiffs and their four children to vacate the dwelling. Later the agency issued a "Notice of Unsafe Building Structure, Order, Notice of Survey and Summons" which stated:

> The above building is structurally unsafe due to collapse of ten feet high and fifty feet long section of concrete retaining wall at rear lot line, which has left rear foundation wall without adequate support and subject to undermining and possible collapse.

On November 20, 1975 the Supreme Court, Richmond County, issued an order which authorized demolition of the structure unless the owners obtained permission from the Department of Buildings to perform the work required to make the structure safe.

In their predicament the plaintiffs wrote the defendant seeking to recover their loss. When the claim was rejected the plaintiffs retained a consulting engineer to determine the cause of the sudden collapse of the retaining wall and its effect on stability and structural condition of the insured premises.

The engineer's report and its conclusions were adopted by Hartford and advanced to the court in support of its motion for summary judgment.[2] The engineer's report and various photographic exhibits are referred to as the basis for the court's conclusion that there was no dispute about the controlling facts and no ambiguities in the language of the insurance contract. On these considerations, coverage was denied

---

the agency was followed by the order to vacate of July 14, 1975.

2. The consulting engineer Daniel J. O'Connell, P.E., stated in his report:

> The loss of lateral support has rendered the rear foundation wall dangerous and totally unfit for its intended use to support the 2-story and attic dwelling. The structural stability of the dwelling has been seriously impaired, and complete collapse on to the adjacent property below will occur when the supporting soil is eroded away sufficiently. Indeed, partial collapse of the dwelling has already occurred. The foundation wall has cracked, and two large vertical cracks are widening due to the loss of its lateral support.
>
> The cause of the collapse of the retaining wall was the expansion of the retained soil as it absorbed water. The expansion of the soil produced greater increased pressure against the retaining wall. The lateral pressure gradually increased until the wall could no longer resist the overturning effect of the lateral pressure and collapsed.
>
> It is important to note that the wall did not tip over about its footing, but rather broke in bending along a plane approximately 2 feet above the ground below. Thus, the increased pressure due to the expansion of the retained soil caused the wall to bend and then crack and break.
>
> After the wall failed the retained soil did not fall but remained standing. The collapse allowed the soil to expand to its normal condition, and its cohesive strength maintained the soil bank in a vertical position and prevented horizontal sliding and vertical subsidence.
>
> The collapse of the wall was not due to so-called hydrostatic pressure due to flowing or impounded free water behind the wall, but solely to the pressure due to expansion of the silt and clay contained in the soil.
>
> CONCLUSIONS:
> 1. The retaining wall collapsed because of greatly increased lateral pressure produced by the expansion of the silt and clay of the retained soil.
> 2. The expansion of the soil was caused by the absorption of static water trapped in the pores of the silt and clay.
> 3. The soil bank did not fall, but remained standing after the wall collapsed.
> 4. The wall was not subjected to pressure from flowing or free standing water impounded behind the wall.
> 5. The collapse of the retaining wall removed the pre-existing lateral support of the rear foundation wall of the 2-story dwelling, and has caused its partial collapse.
> 6. The loss of lateral support of the rear foundation wall has rendered it dangerous and totally unfit for its intended use.
> 7. The rear wall will surely collapse when the laterally unsupported soil on which it rests erodes sufficiently.
> 8. The rear wall must be properly shored up immediately to prevent collapse and irreparable damage to the dwelling.

as a matter of law and the action was dismissed.

The Home Owners Policy, issued by the defendant Hartford, undertook to insure losses sustained at the plaintiffs' dwelling and included peril 14 which provides:

> Collapse of buildings or any part thereof, but excluding loss to outdoor equipment, awnings, fences, pavements, patios, swimming pools, underground pipes, flues, drains, cesspools and septic tanks, foundations, retaining walls, bulkheads, piers, wharves, or docks, all except as the direct result of the collapse of building.
>
> Collapse does not include settling, cracking, shrinkage, bulging or expansion.

The "Additional Exclusions" include exclusions 2 and 3 which declare that the policy does not insure against loss:

> 2. caused by, resulting from, contributed to or aggravated by any earth movement, including but not limited to earthquake, volcanic eruption, landslide, mudflow, earth sinking, rising or shifting; unless loss by fire or explosion ensues, and this Company shall then be liable only for such ensuing loss;
>
> 3. caused by, resulting from, contributed to or aggravated by any of the following:
>
>   a. flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not;
>
>   b. water which backs up through sewers or drains; or
>
>   c. water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basement or other floors or through doors, windows or any other openings in such sidewalks, driveways, foundations, walls or floors; unless loss by fire or explosion ensues, and this Company shall then be liable only for such ensuing loss, but these exclusions do not apply to loss by theft; . . ..

Judge Dooling concluded the subsurface water (Exclusion 3) was not involved. However, the court went on to hold that Exclusion 2, "—any earth movement, including but not limited to—landslide"—when the words are given their exact meaning, caused the damage to the plaintiffs' dwelling and was an excluded cause. The court's decision on this point is based on the demonstration of the photographs submitted and the engineer's opinion that the direct cause of the injury to the plaintiffs' dwelling was the loss of lateral support due to the sudden removal of the earth between the rear wall of the building and the retaining wall. While the bare photographs contained in the record on appeal show a disruption of the earth that was once retained by the wall, there is no demonstration that the outward displacement caused the partial collapse referred to in the engineer's report. Beyond that, the inference drawn by the court was directly contradicted by the affidavit of the consulting engineer O'Connell in opposition to the defendant's motion for summary judgment. He there stated—"There was no earth movement as there was no displacement of the center of gravity and the expansion and contraction involved did not represent any movement of soil which in the instance of the matter at bar remained in place." Earlier in the affidavit the plaintiffs' engineer stated he was "categorically of the opinion—that the substantial damage involved was not due to any earth movement."

The record presents the issue of whether there was any earth movement within the intendment of the exclusion and, if so, whether such movement was the cause of the damage to the plaintiffs' home. See *Gullett v. St. Paul Fire and Marine Ins. Co.*, 446 F.2d 1100, 1102 (7th Cir. 1971).[3] Although the inference reached by the

---

3. Joint appendix 41a.

Although the language of the policy refers to "any earth movement," there remains some question whether the doctrine of *ejusdem generis* limits the term to violent earth disturbances such as earthquake, volcanic eruption, landslide, etc. See *Gullett v. St. Paul Fire and Marine Insurance Company*, 446 F.2nd 1100, 1103 (7th Cir. 1971).

court certainly is not without some logic, we are called upon to construe the matter addressed to the motion most favorably to the party against whom judgment was entered. E. g. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The moving papers and the opposing affidavits generate genuine and conflicting issues for trial which preclude disposition on these points by way of summary judgment. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

█ That does not conclude our review since the grant of summary judgment was principally based on the premise that there was no collapse of the dwelling. On the strength of the engineer's findings, Judge Dooling held there was no collapse of the dwelling house as a matter of law and thus drained the controversy of any triable issue of fact. In reaching this result it is at once apparent, as Judge Dooling recognized, that there is a clear division in the courts of New York in dealing with the word "collapse." By any conspectus, the law of New York is unsettled on the point.[4]

Despite the uncertainty that prevails among the courts of New York at the intermediate appellate level, the cases referred to in the margin express the general concept that "collapse," as written in the context of homeowner's coverage, means a sudden impact that is destructive of the structural integrity of the insured building. To be sure, no hard and fast rule has emerged in New York nor in other jurisdictions. See 72 ALR 2d 1287. In sum, the expression "collapse of buildings or any part thereof" in terms of insurance coverage, is a coat of varied colors. The question of what constitutes a collapse is largely one of degree. And there is nothing in the law of New York, as we have searched it, that requires the insured property be demolished nor reduced to rubble. The body of the law written in other jurisdictions is not so unyielding in the construction of policies drawn by an insurer to afford protection to homeowners. E. g. *Government Employees Insurance Company v. De James,* 256 Md. 717, 261 A.2d 747 (1970); *Travelers Fire Insurance Co. v. Whaley,* 272 F.2d 288 (10th Cir. 1959).[5]

---

4. Some reliance however, was imposed on *Weiss v. Home Insurance Company,* 9 A.D.2d 598, 189 N.Y.S.2d 355 (App.Div. 3d Dept. 1959). The questions presented on appeal were whether a boat dock constructed of timber cribbing filled with rock and stones was a "building" within the meaning of the insurance agreement; and, if so, whether the breakdown of the cribbing, which caused some of the rocks to spill into the lake, constituted a "collapse" of the building. The reviewing court agreed with the trial court's determination that the dock was not a building within the policy coverage. The court went on to add that the affirmance could be sustained for want of evidence that the damage to the dock constituted a "collapse," noting that "the word involves an element of suddenness, a falling in, and total or near destruction." Since the evidence readily permitted a determination that the damage to a portion of the dock was due to age and deterioration, the claimant's proof failed on the secondary issue as well. *Id.* at 357.

It appears from the dissenting opinion filed in *Nixon v. Liberty Mutual Insurance Companies,* 16 A.D.2d 863, 228 N.Y.S.2d 450, 451 (4th Dept. 1962) a more generous construction was adopted by the majority. The court affirmed coverage under the collapse clause where snow accumulated on the roof of a dwelling, slid onto a sun deck and carport below. The event was accompanied by a loud crash, the home shook and produced interior damage to floor and walls. The building remained intact and the owners continued their residence there.

In *Graffeo v. United States Fidelity and Guaranty Co.,* 20 A.D.2d 643, 246 N.Y.S. 258 (2d Dept. 1964) the policy in suit excluded loss caused by the settling of the foundation unless collapse ensued. The court held that the settling of a concrete slab under a dwelling structure which caused the interior wall to pull away from the ceilings did not constitute a "collapse" and quoted the definition offered in *Weiss, supra.*

5. The facts stated in the *Whaley* case have a similar bearing with those presented in the record here.

There is no claim that the building, or any part thereof, collapsed in the sense that it tumbled down or fell in a heap. The court found that on or about April 12, 1957, the basement walls cracked and broke on the west, north and south walls of the residence; that this cracking of the basement walls withdrew the support necessary for the first floor and caused damage to the ceiling, rafters, and to the upper walls of the first floor resulting in material damage to the structure. The court further found that a portion of the

In the unsettled state of the law of New York on a point not yet addressed by the highest state court, in terms of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), our forecast of its future development precludes the absolute construction given to the insurance contract by the district court. Trial on the merits should not be thus constricted.

 Here the Department of Buildings found the dwelling was structurally unsafe and subject to possible collapse. The property was later condemned. The parties to the contract certainly did not contemplate that the insured would be called upon to wait for a total destruction to take place to achieve coverage under the policy.

The plaintiff Albert Bailey's narrative of the events that occurred during the nighttime storm of July 13, 1975, permits the inference that the force which brought on the outward disintegration of the retaining wall was swift and violent. His engineer's report of the facts and his conclusions compose a triable issue on whether the final injury was caused by a movement of the earth within the exclusionary provision of the policy. And lastly, the order for the demolition of the insured property issued by the Supreme Court, Richmond County, presented a genuine factual issue on the totality of the destructive force that was visited on the insured premises at the time the plaintiffs' loss was sustained.

We hold it was error to preclude the trial of these questions as a matter of law. The

residence had fallen so that the substantial integrity of the building had been impaired to such an extent as to render it unsuitable for use as a home; that in addition, this fall of a part of the building exposed it to the inclemency of the weather and rendered its contents more easily subject to the elements. It is contended that the record does not support a finding that there was a collapse of a part of the building within the meaning that must be ascribed to that term as used in the policy. *Id.* at 289.

The court of appeals in the Tenth Circuit affirmed the judgment entered for the insured and went on to express what we believe to be a fair and correct statement of the law:

If the appellant intended that the word "collapse" should be ascribed the abstract

judgment is reversed and the cause remanded.

dictionary definition it now contends for, it should have so stated. In the absence of such an expressed intent, we think it more realistic to define the terms in such a contract as connoting a sinking, bulging, cracking, pulling away of the wall so as to impair its function of supporting the superstructure and destroying its efficiency as a habitation. *Id.* at 290.

We are mindful that the policy in suit specified that "(c)ollapse does not include settling, cracking, shrinkage, bulging or expansion." The record indicates something more than mere settling and cracking. There was evidence of the exertion of a sudden and violent force that destroyed the building as a dwelling house.